IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| Brian Moses and Clearvision Media, Inc., on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>Capital One Financial Corporation, d/b/a Capital One, d/b/a Capital One Shopping,<br><br>*Defendant*. | Case No.: 1:25-cv-39<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFFS' CLASS ACTION COMPLAINT**

Plaintiffs Brian Moses (Moses) and Clearvision Media, Inc. (Clearvision), (collectively "Plaintiffs"), by and through their undersigned counsel, plead on their own behalf and on behalf of all others similarly situated. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

### I.   HOW BIG TECH RUINED AFFILIATE LINKS

1. Plaintiffs are content creators and marketers who earn substantial revenue through contracts promoting products and services from third parties.

2. As a part of Plaintiffs' businesses, Plaintiffs receive commissions and other benefits when they refer audience members to purchase the product or services of their contractual partners in an online store.

3. Plaintiffs use individualized tracking links and promotional codes (collectively, "Affiliate Links") that tell their partners that a particular online customer was referred by that

1

plaintiff.

4. By virtue of the Affiliate Links, Plaintiffs (who referred the customer to the store) receive attribution for the referral when a customer checks out of an online store. This is the online equivalent of a salesperson being acknowledged that they helped a customer when the customer goes to the cash register (and receiving a sales commission for the help they provided).

5. Defendant Capital One Financial Corporation ("Defendant" or "Capital One") owns Capital One Shopping, formerly known as Wikibuy, a browser extension that purports to find consumers the best deal at checkout by "instantly scanning a multitude of retailers across the internet. At the same time, it automatically locates, verifies and applies valid coupons."[1]

6. Defendant offers Capital One Shopping to online shoppers as a free browser extension that purports to save shoppers money. These representations have attracted over 9 million users (on the Google Chrome browser alone) who use the Capital One Shopping browser extension to find deals online.[2]

7. Online marketers, such as YouTubers and online influencers, direct their followers and viewers to specific products and services and earn commissions and other benefits when their audience members purchase the products and services they are promoting.

8. Online merchants work with these online marketers through affiliate marketing programs ("Affiliate Programs"),[3] which rely on attribution tracking through Affiliate Links (which create unique HTML tracking tags or cookies) to determine who gets credit for online referrals and product sales.

---

[1] See https://www.capitalone.com/tech/software-engineering/saving-money-online-is-easy-and-fast-with-wikibuy-from-capital-one/ (last visited Jan. 6, 2025).
[2] See https://chromewebstore.google.com/detail/capital-one-shopping-save/nenlahapcbofgnanklpelkaejcehkggg?hl=en-US&pli=1 (last visited Jan. 6, 2025).
[3] "Affiliate Programs" come in several forms, including but not limited to sponsorship relationships (usually on a flat fee, percentage, or "cost per acquisition" basis), endorsement relationships, or participation in a formalized affiliate relationship or platform (usually on a fee or percentage basis).

9. The online marketer provides Affiliate Links to their audience and, if someone clicks on that link or uses that code immediately prior to making a purchase, the online marketer receives affiliate attribution credit for the sale.

10. The industry refers to this practice as "last click attribution."

11. This case involves a scheme by Defendant to unlawfully steal the attribution for online sales from Plaintiffs by using Capital One Shopping to intentionally supplant Plaintiffs' affiliate attribution and replace it with their own, thereby taking all benefits that would have otherwise gone to the Plaintiffs.

12. The online marketers whose benefits were redirected, which include Plaintiffs and the Proposed Class as described below, are entitled to damages for Defendants' predatory and unfair conduct.

13. Plaintiffs and the Proposed Class are also entitled to injunctive relief as deemed appropriate by the Court.

14. Because Defendant, *via* Capital One Shopping, has standardized practices and procedures to which all online marketers are subject or affected by, the appropriate vehicle for recovery is a class action lawsuit.

## II. JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

15. Under 28 U.S.C. § 1332(d), the Class Action Fairness Act, this Court has jurisdiction over the claims alleged herein. As alleged below, this claim has all of the following: (1) minimal diversity (including, but not limited to, Plaintiffs); (2) 100 or more putative class members; and (3) more than $5 million dollars in controversy.

16. This Court has personal jurisdiction over Capital One because Capital One has its principal headquarters in McLean, Virginia, does business in Virginia, directly or through agents, and has sufficient minimum contacts with Virginia such that it has intentionally availaed itself of

the laws of the United States and Virginia.

17. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a) and (d) because Capital One's headquarters and principal place of business are located in this District, Capital one resides in this district, and a substantial part of the events or omissions giving rise to the claims occurred in or emanated from this district, including without limitation, decisions made by Capital One's governance and management personnel.

### III.     PARTIES

18. Plaintiff Brian Moses is an individual residing in Wylie, Texas.

19. Plaintiff Clearvision Media, Inc., is a Nevada corporation, with headquarters in Nevada.

20. Defendant is, and at all times mentioned herein was, a corporation with the principal place of business at 1680 Capital One Drive, McLean, Virginia 22102-3491. Its agent for service of process is Corporation Service Company, at 100 Shockoe Slip, Floor 2, Richmond, Virginia, 23219-4100.

21. Capital One Shopping is a browser extension, free to consumers, which purports to "instantly scan[ ] a multitude of retailers across the internet. At the same time, it automatically locates, verifies and applies valid coupons.[4]

22. On information and belief, Defendant acquired/holds all assets and liabilities of Wikibuy, LLC and Wikibuy Holdings, LLC, two subsidiary corporations, in 2018.  Wikibuy originally developed the Capital One Shopping browser extension. Capital One Financial Corporation, as well as these two subsidiary corporations, are collectively referred to herein as "Capital One."

---

[4]  *See* https://www.capitalone.com/tech/software-engineering/saving-money-online-is-easy-and-fast-with-wikibuy-from-capital-one/ (last visited Jan. 6, 2025).

23. Capital One has partnered with over 30,000 businesses to include Capital One Shopping in those businesses' online checkout process ("Defendant's merchant partners") for any consumer who has downloaded the browser extension.[5]

24. Plaintiffs are content creators with followings on YouTube, Instagram, and Tiktok, as well as other social media platforms and the internet.

*Plaintiff Moses*

25. Moses is a content creator that earns commission payments from affiliate marketing links he shares on his YouTube channel (@briancmoses). The primary source of income he receives from his content creations is via affiliate links on his blog.

26. Moses regularly partners with online merchants, including Capital One's merchant partners, to promote products and services in their videos to increase his affiliate commission payments.

27. Moses would have earned more income in the form of commission payments from his affiliate marketing links but for Capital One's scheme to usurp commissions through the Capital One Shopping browser extension.

28. Capital One, via its browser extension, stole credit for sales and conversions that Moses originated through his own platforms, emanating from the affiliate marketing links he shared on his platforms.

*Plaintiff Clearvision*

29. Plaintiff Clearvision, also known as Think Media and Think Media TV, is a digital media company that primarily focuses on providing educational content for content creators, especially on YouTube. The company is known for its videos, podcasts, and courses that offer

---

[5] *See* https://www.capitalone.com/learn-grow/money-management/capital-one-shopping/ (last visited Jan. 6, 2025).

advice on growing YouTube channels, improving video production, and using video as a tool for business growth.

30. Clearvision is a huge YouTube strategy channel with over 3 million subscribers and thousands of videos breaking down the best way to grow your channel, the best tech to use, editing tips, and more. Clearvision was founded by Sean Cannell, a YouTube strategist and international speaker. His various YouTube channels have over 2.5 million subscribers.

31. Clearvision has agreements with online merchants for promotion and affiliate sales with third parties.

32. Capital One, via its browser extension, stole credit for sales and conversions Clearvision originated through its own platforms, emanating from the affiliate marketing links Clearvision shared on its various platforms.

## IV. FACTUAL ALLEGATIONS

### *How Customer Attribution Works*

33. The growth of social media platforms like YouTube has driven online retailers to collaborate with online marketers—including influencers, bloggers, and reviewers—to promote their products.

34. These online marketers earn commissions and other benefits by directing their followers to Affiliate Links.

35. Affiliate Links may embed tracking tags or utilize a unique coupon or promotional code, which identify the source of a purchase and allow merchants to allocate commissions or other benefits to the appropriate online marketer.

36. The internet marketing industry relies on last click attribution to determine commission payments, wherein the most recent Affiliate Link used before purchase receives 100%

of the credit and attribution. For example, a customer might click on a blogger's affiliate link to explore a product but delay their purchase. Weeks later, the customer might watch a YouTube video from a different content creator promoting the same product. If the customer then clicks the YouTuber's affiliate link and completes the purchase, the YouTuber receives credit under the last click attribution model because their link was the most recent referral.

37. Online retailers aggregate Affiliate Link data to determine how many customers are attributable to any given source. This data is the most common way to determine how successful Plaintiffs were in driving traffic to websites and acquiring customers. Affiliate Link tracking therefore plays a crucial part in defining current and future business relationships with Plaintiffs.

38. Last click attribution is the industry standard and, upon information and belief, is the model by which all or most of Plaintiffs' business partners operate. The vast majority of online retailers credit only the source listed at the very last instance before making a purchase. Thus, Affiliate Programs are "winner take all."

### *How Capital One Shopping Misappropriates Affiliate Marketing Benefits*

39. Defendant markets its Capital One Shopping browser extension as a free tool for online shoppers, promising to search the internet for discount codes that can be applied to items already in the user's shopping cart. Defendant purports to operate by gathering coupon codes on websites or through user submission that are potentially applicable to a user's purchase.

40. Defendant, through its browser extension, has exploited these Affiliate Programs to divert commissions and other benefits from their rightful owners. Capital One Shopping manipulates online shopping sessions to replace existing affiliate attribution with its own, falsely claiming credit for referrals and appropriating commissions and other benefits intended for the online marketers.

41. The Capital One Shopping extension operates covertly, altering network

communications between a user's browser and the online retailer's website. By removing and replacing affiliate attribution, Capital One Shopping shifts referral credit to Defendant without the user's knowledge. For example, if a consumer clicks on a YouTuber's Affiliate Link to purchase a promoted product, Capital One Shopping's interference can result in a commission or other benefit being rerouted to Defendant instead of the YouTuber even where Capital One Shopping provided no benefit to the consumer.

42. Defendant capitalizes on the last click attribution mechanism by generating simulated referral clicks. Through pop-ups encouraging users to apply coupons or earn rewards, Defendant's extension creates the appearance of a new referral, displacing the original marketer's Affiliate Link and affiliate attribution, thus securing 100% of the credit for itself.

43. Defendant utilizes several deceitful and clandestine methods to displace rightful referrers like Plaintiffs and the Class.

*Simulated Discounts*

44. In one scenario, a shopper may add an item to their cart after using an Affiliate Link shared by a marketer. During checkout, Capital One Shopping might display a pop-up claiming to have found a promo code. If the shopper clicks "Try Codes," Capital One Shopping replaces the marketer's affiliate attribution with its own, thereby stealing the commission or other benefits, even where Capital One Shopping provided no benefit to the customer.

*No Coupon Needed*

45. Even when Capital One Shopping fails to locate a discount, it prompts the shopper with messages like "We searched for you but didn't find any deals" or "You already have the best price." Clicking these messages still triggers the replacement of the original marketer's affiliate cookie with Capital One Shopping's affiliate cookie, ensuring that Defendant receives the commission or other benefits.

8

### *Cash Back Program*

46. Capital One Shopping also offers a reward system, allowing users to earn points redeemable for gift cards. Shoppers are enticed to click Capital One Shopping's pop-ups with promises of rewards, regardless of coupon availability. This process, again, overrides the original affiliate attribution and allows Defendant to steal the commission or other benefits.

### *Impact on Content Creators and Marketers*

47. Through these deceptive practices, Defendant systematically diverts commissions from rightful earners, undermining the affiliate marketing system. Adding to the irony, Defendant enlists content creators and influencers to promote the Capital One Shopping browser extension to their audiences, effectively enabling it to usurp the commissions and other benefits those same creators depend on for income.

48. Defendant designed its Capital One Shopping browser extension to take credit for customer acquisition for which it is not responsible and for which, were the browser extension not in place, Plaintiffs would be properly credited.

49. In addition to taking the direct and indirect benefits that Plaintiffs would have received by stealing the affiliate attribution, Defendant's actions have damaged Plaintiffs' relationships with business partners.

50. Defendant's actions have caused Plaintiffs to receive less favorable contract terms from their business partners and/or led to a failure to renew contracts between Plaintiffs and their business partners.

51. Plaintiffs' contractual business partners regularly evaluate whether Plaintiffs are overperforming or underperforming regarding the business's benchmark for average customer acquisition costs—*e.g.*, the businesses track how many customers have been acquired via Plaintiffs' Affiliate Link and divide that number into amounts paid to Plaintiffs to determine if customer

acquisition is less or more costly via Plaintiffs than anticipated.

52. If Plaintiffs are overperforming regarding a contractual business partner, then that business partner is more likely to renew contracts with Plaintiffs and offer them better terms on future contracts.

53. Defendant benefitted by disrupting last click attribution which should have been attributed to Plaintiffs by receiving credit for customer acquisition.

54. Because Defendant received credit for customer acquisition instead of Plaintiffs, Defendant benefitted at Plaintiffs' expense.

55. Defendant misrepresented the nature of their actions and took steps to hide and obfuscate them from customers and marketers alike.

56. Defendant misrepresented the nature of its product and services to consumers to entice them to download the Capital One Shopping extension.

57. Defendant's actions are a violation of the terms of service of the online merchants with whom it partners.

58. Plaintiffs have suffered substantial economic damages as a result of Defendant's malicious and covert browser extension.

***Defendant's Extensive Records of Their Actions***

59. Consumer shopping data is extremely valuable to tech companies such as Defendant. As a result, Defendant keeps extensive records of every transaction completed using Capital One Shopping.

60. For every completed Capital One Shopping transaction, Defendant records (in a searchable database), among other things: the exact time and date, store, user ID, device ID, visitor ID, session ID, referrer URL, first referrer URL, location (including city and country), browser, and client.

61. In other words, Defendant knows exactly whose affiliate attribution it replaced and how it was replaced.

## V.   CLASS ACTION ALLEGATIONS

### A.   *Online Marketer Class*

62. Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(b)(3) and/or (c)(4) for monetary damages on behalf of themselves and all others similarly situated.

63. Plaintiffs' proposed Class is as follows, subject to amendment as appropriate:

> All persons (corporate or individual) in the United States who participated in an Affiliate Commission Program with a United States online merchant and had affiliate attribution redirected to Capital One as a result of the Capital One Shopping browser extension.

64. Excluded from this class definition are the Defendants and their officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge and/or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

65. Plaintiffs reserve the right to modify this class definition as they obtain relevant information, including attribution tracking data and other records, through discovery.

66. Each of the persons identified in this Putative Class has been harmed by the acts of Defendant because Defendant interfered with a business relationship of each member of the Putative Class, as well as converted each Class member's rightfully owed commissions and other benefits.

67. Defendant has been unjustly enriched at the expense of each member of the Putative Class.

### The Action Meets the Requirements to be Certified as a Class

68. Plaintiffs are members of the proposed Class.

69. The proposed Class can be identified through Defendant's records and merchant

partners' databases.

    **B.**    *Numerosity*

70.    The number of Putative Class Members is believed to be in the thousands, rendering the class so numerous that individual joinder of all Class Members is impracticable.

71.    The exact number and identities of the Class members are unknown at this time and can only be ascertained through discovery. Identification of the Class members is a matter capable of ministerial determination from Defendant's records.

    **C.**    *Common Questions of Law and Fact*

72.    There are common questions of law and fact raised in this Complaint which predominate over any questions affecting only individual Class members.

73.    The following questions of law and fact common to the Class members are ripe for determination:

    (a)    Did Defendant program and design the Capital One Shopping browser extension in a manner that wrongfully credits it as the originator of affiliate sales referrals;

    (b)    Did Defendant's policies and practices effectively steal attribution from members of the Putative Class?

    (c)    Did Defendant profit from customer acquisition which was generated by members of the Putative Class?

    (d)    Did Defendant's actions in stealing attribution from Plaintiffs damage the relationship between Defendant's merchant partners and members of the Putative Class?

    (e)    Whether Defendant intentionally damaged the relationship between Defendant's merchant partners and members of the Putative Class?

    (f)    The nature and scope of appropriate injunctive relief.

    **D.**    *Typicality*

74.    Plaintiffs' claims are typical of the claims of the proposed Putative Class. In

addition, Plaintiffs are entitled to relief under the same causes of action and upon the same facts as the other Members of the Proposed Putative Class.

### E. *Adequacy*

75. Plaintiffs are adequate representatives of the proposed Putative Class because their interests coincide with, and are not antagonistic to, the interests of the Members of the proposed Putative Class they seek to represent; they have retained counsel competent and experienced in such litigation; and they intend to prosecute this action vigorously. Plaintiffs and their Counsel will fairly and adequately protect the interests of Members of the proposed Putative Class.

### F. *Superiority*

76. Questions of law and fact common to the proposed Putative Class Members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. Liability will be determined based on a common set of facts and legal theories. Willfulness will be determined based on Defendant's conduct and knowledge, not upon the effect of Defendant's conduct on Putative Class Members.

77. The damages sought by each member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for the Members of the proposed Putative Class to individually redress effectively the wrongs done to them, as the claims alleged herein have no attorney's fee shifting provision. Even if the Members of the proposed Putative Class themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in

substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in just one case.

78. Class certification is appropriate because Defendant has acted on grounds generally applicable to the proposed Putative Class, making appropriate equitable injunctive relief with respect to Plaintiffs and the proposed Putative Class Members. Fed. R. Civ. P. 23(b)(2).

79. <u>Injunctive and Declaratory Relief Appropriate.</u> Defendant has acted on grounds generally applicable to the Putative Class, thereby making final injunctive relief and corresponding declaratory relief with respect to the Putative Class appropriate on a class-wide basis. Moreover, on information and belief, and based on their experience, Plaintiffs allege that Defendant's practices in stealing attribution from members of the Putative Class as complained of herein are substantially likely to continue in the future if an injunction is not entered.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

80. Plaintiffs hereby incorporate by reference and re-allege each and every allegation set forth in each and every preceding paragraph of this Complaint, as though fully set forth herein.

81. Plaintiffs had existing contractual relationships with one or more of Defendant's merchant partners.

82. Defendant knew those contractual relationships existed. Defendant knew that its merchant partners collaborated with Plaintiffs and members of the Putative Class to drive traffic to merchant partners' websites via Affiliate Links.

83. Defendant's conduct prevented performance of Plaintiffs' contractual obligations and/or made performance more expensive or difficult.

84. Defendant intended to disrupt the Plaintiffs' performance of Plaintiffs' contracts and/or knew that Defendant's actions made performance more expensive or difficult or impossible.

85. Defendant's interference harmed Plaintiffs and members of the Putative Class by artificially and negatively skewing the data regarding customer acquisition via Affiliate Links, causing members of the Putative Class to appear to merchant partners to underperform relative to actual customer acquisition.

86. Defendant's conduct was a substantial factor in causing Plaintiffs and the Putative Class harm.

87. By virtue of the foregoing, Plaintiffs and members of the Putative Class have been harmed and incurred damages cumulatively in an amount that exceeds $5,000,000.

## SECOND CAUSE OF ACTION
### INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

88. Plaintiffs hereby incorporate by reference and re-allege each and every allegation set forth in each and every preceding paragraph of this Complaint, as though fully set forth herein.

89. Plaintiffs had economic relationships with merchants that probably would have resulted in economic benefits to Plaintiffs.

90. Defendant was aware of the relationships.

91. Defendant's conduct as described above of removing Plaintiffs' Affiliate Links, and replacing with their own affiliate attribution, after Plaintiffs directed consumers to merchant checkout pages was wrongful.

92. By engaging in this conduct, Defendant intended to disrupt the relationships and/or knew that disruption of the relationship was certain or substantially certain to occur.

93. Plaintiffs' relationships were disrupted.

94. Defendant's conduct was a substantial factor in causing Plaintiffs and the Putative

Class harm.

95. By virtue of the foregoing, Plaintiffs and members of the Putative Class have been harmed and incurred damages cumulatively in an amount that exceeds $5,000,000.

### THIRD CAUSE OF ACTION
### Unjust Enrichment

96. Plaintiffs herby incorporate by reference and re-allege each and every allegation set forth in each and every preceding paragraph of this Complaint, as though fully set forth herein.

97. Plaintiffs have a clear legal and equitable interest in the commissions and other benefits they rightfully earned, which Defendant has wrongfully diverted for its own benefit.

98. Defendant unjustly received and retained these commissions and other benefits through the actions of its Capital One Shopping browser extension, which misappropriated affiliate attribution.

99. Defendant knowingly benefitted from these diverted commissions and other benefits, fully aware that its browser extension caused the financial harm described herein.

100. Plaintiffs have suffered financial loss as a direct result of Defendant's actions. These losses stem from commissions and other benefits that would have otherwise been paid to Class Members had Defendant not diverted the proper affiliate attribution with their own.

101. Retention of these improperly acquired funds by Defendant is inequitable and unjust.

102. Defendant continues to profit from the unjust conduct of the Capital One Shopping browser extension.

103. Class Members continue to have their affiliate commissions and other benefits diverted to Defendant.

104. Defendant's unjust enrichment is directly and proximately related to the Capital

One Shopping browser extension's ability to divert affiliate commissions and other benefits by manipulating affiliate tracking codes to enrich itself with benefits it did not rightfully earn.

105. Plaintiffs did not willingly divert their affiliate commissions and other benefits to Defendant, and it would be inequitable and unjust for Defendant to retain the benefit.

106. Plaintiffs seek restitution, requiring Defendant to return improperly obtained commissions and other benefits, along with any additional relief deemed appropriate by the Court.

## FOURTH CAUSE OF ACTION
### CONVERSION

107. Plaintiffs hereby incorporate by reference and re-allege each and every allegation set forth in each and every preceding paragraph of this Complaint, as though fully set for herein.

108. Plaintiffs held a rightful interest in the commissions and other benefits they earned from Affiliate Links. These commissions and other benefits constitute identifiable sums owed to them.

109. Defendant, through the Capital One Shopping browser extension, wrongfully took possession of these commissions and other benefits without authorization and exercised ownership over them, depriving Plaintiffs of their rightful property.

110. This unauthorized control over Plaintiffs' and Class Members' earned commissions and other benefits constitutes conversion.

111. Plaintiffs suffered financial losses as a direct result of Defendant's conversion.

112. Plaintiffs seek compensatory damages, attorneys' fees, and any additional relief deemed appropriate by the Court.

## INJUNCTIVE RELIEF

113. Plaintiffs hereby incorporate by reference and re-allege each and every allegation set forth in each and every preceding paragraph of this Complaint, as though fully set forth herein.

114. Plaintiffs, on behalf of themselves and the Putative Class, also seek injunctive relief prohibiting Defendant's policies and practices described herein.

115. "In order to obtain injunctive relief, the wrong or injury resulting from the pursuit of a trade or business must be plainly manifest or certain to follow." *Daniel v. Kosh,* 173 Va. 352, 352, 4 S.E.2d 381 (1939).

116. Injunctive relief is appropriate under Fed. R. Civ. P. 23(b)(2)

117. Defendant's misconduct does not constitute a single past act but rather a pattern of established practices that has already resulted in injury and will continue to do so unless this Court grants injunctive relief on behalf of Plaintiffs and the Putative Class.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court grant Plaintiffs and the Class the following relief against Defendant:

a. That the Court declare, adjudge, and decree that this action is a proper class action and certify the proposed Class and/or any other appropriate Class under F.R.C.P. Rule 23 (b)(1), (b)(2), and/or (b)(3), including the appointment of Plaintiffs' counsel as Class Counsel;

b. For an award of damages, including actual, nominal, consequential, and punitive (exemplary) damages, disgorgement, and restitution, as allowed by law in an amount to be determined at trial;

c. A permanent injunction restraining Defendant from replacing pre-existing attribution from Plaintiffs and members of the Class with its own attribution at checkout;

d. For prejudgment interest on all amounts awarded, at the prevailing legal rate;

e. Any and all statutorily enhanced fees;

f. For an award of attorney's fees, costs, and litigation expenses, as allowed by law;

g. For all other Orders, findings and determinations identified and sought in this Complaint;

 h. Leave to amend the complaint to conform to the evidence presented, including at trial; and

 i. All general, special, and equitable relief to which Plaintiffs and the members of the Class are entitled to by law.

Date: 01/09/2025,          Respectfully submitted,

                  /s/ _____

Seth Carroll
Virginia Bar No. 74745
**COMMONWEALTH LAW GROUP, PLLC**
3311 West Broad Street
Richmond, Virginia 23230
Phone: (804) 999-9999
Fax: (866) 238-6415

**EKSM, LLP**
Josh Sanford*
Arkansas Bar No. 2001037
Jarrett Ellzey*
Texas Bar No. 24040864
Leigh S. Montgomery*
Texas Bar No. 24052214
Tom Kherkher*
Texas Bar No. 24113389
jsanford@eksm.com
jellzey@eksm.com
lmontgomery@eksm.com
tkherkher@eksm.com
1105 Milford Street
Houston, Texas 77006
Phone: (888) 350-3931
Fax: (888) 276-3455

**EAGLE TEAM LLP**
Devin J. Stone*
Washington Bar No. 260326
1050 Connecticut Ave. NW, Suite 5038
Washington, DC 20036
Phone: (833) 507-8326
devin@eagleteam.law

**ATTORNEYS FOR PLAINTIFF AND THE PUTATIVE CLASS**

(* denotes *pro hac vice* forthcoming)